Opinion delivered March 18, 1887.

## No. 2277.

## Frank Chew *v.* The State.

Theft—Evidence.—In a trial for theft, the State, for the purpose of rebutting proof of alibi, proved a statement of defendant that he was not at the wedding of one H., and then, over objection, was permitted to put in evidence the marriage license of H., with the minister's certificate of its solemnization. *Held*, that it was error to admit in evidence the marriage license and certificate, because, with relation to the accused, they were *res inter alios acta*. The proper evidence of the fact of the marriage and its date would have been the testimony of some one who was present when it was solemnized.

Appeal from the District Court of Gonzales. Tried below before the Hon. George McCormick.

Appellant was convicted of the theft of a mule, the property of J. S. Holden, on February 14, 1882. A term of five years in the penitentiary was the punishment assessed against him.

J. S. Holden, for the State, testified that he lived in Llano county, Texas, some hundred and fifty miles from the county seat of Gonzales county. He was the owner of the mare mule charged to have been stolen. In the afternoon of February 14, 1882, he put shoes on the hind feet of said mule, and then turned her into his pasture. The shoes he put on her were steel pointed, turned down at the ends, with very long heels, made for travel among rocks, and would leave peculiar tracks. The next morning after putting shoes on the mule witness went to his pasture to get her, and she was gone. In the pasture he found not only her tracks but also the tracks of two or three ponies which had passed into the pasture, and which, together with the mule, as shown by her tracks, had passed out of the pasture. By means of the mule's track, and of information received by the witness, he followed the mule across the country and through New Braunfels to Spot Smith's in Guadalupe county, where he got information about the mule and stayed all night. The witness detailed his further pursuit until he trailed his mule into Willis Arrington's pasture, in Gonzales county. The last he saw of the tracks was in Arrington's pasture. Witness went to C. Burnett's house, and remained two or three days in that section, looking for his mule and also for a man called Frank Chew. At that time the witness did not know the appellant. Witness then had a writ for the man who stole his mule, but did not remember whether any one's name was alleged in the writ. From that trip the witness returned to his home without finding his mule or arresting any one. About eighteen months afterwards he received information from the county attorney of Gonzales county that L. M. Kokernot had the mule, and from Kokernot the witness recovered the mule about eighteen months after he lost it. It was stolen on the night of February 14, 1882, from Llano county. No person had witness's consent to take it. A man can ride from witness's place in Llano county to Gonzales county in three or four days. Witness got the writ after he got to the town of Gonzales, and an officer named Collins accompanied him

to the Arrington pasture in search of the mule and the appellant, but neither of them was found there or then.

Spot Smith, for the State, testified that in February, 1882, and prior to the twenty-fourth of that month, J. S. Holden was at witness's house, hunting for a stolen mule. Two days previous thereto the witness, several miles from his house, was met in the road by a young man who was riding a large bay mare mule, which was branded S on the shoulder. The young man asked witness where Jett Smith lived, and witness replied that Jett Smith lived with him; whereupon the young man accompanied witness to his house and stayed there all night. Witness noticed that the mule was a very large, fine mule, and spoke to the young man about trading for it. At first the young man talked like he would trade the mule, but afterwards he said he would not trade it, because his father had a match for it at home. He said his name was Jones, that he was returning from Llano county up in the mountains, and that he lived on the Sandies, in the neighborhood of Burnett and Mike Light; and he spoke in a way that showed he was familiar with the country and people on the Sandies, and said he was going there to ride wild horses for Burnett. He said he was a horse breaker, and complained of being tired from hard riding. The next morning the young man brought his mule from the lot into the yard where his saddle was, and saddled the mule there. As he walked about, the witness observed that he had a peculiar step with one of his legs, as if caused by a catch in the hip. Here the witness was asked to look around and say if he then saw the said young man in the court room, and thereupon he pointed defendant out as the man. His looks at this trial are more manly and less boyish than when he was at witness's house in February, 1882, some five years ago. Witness would not be positive as to defendant's identity with the young man he had been speaking of, but, noticing the defendant as he walked about the court, witness observed that he has the same peculiar walk as the young man had. When Holden was at the house of witness, the latter observed him looking at the tracks made by the mule when brought into the yard to be saddled; and Holden, when he left, took the same road taken by the young man when he left. Witness noticed the peculiar tracks made by the mule, and was positive they were the tracks of the animal ridden by the young man to and from witness's house.

Ed. Montgomery, for the State, testified that in February,

1882, he lived on the place of E. Qualls, in Gonzales county, Texas. During the first part of that month, three young men came to the store of Qualls, got sardines and ate a snack there, and then mounted their horses, all three of them being small pony horses. In a week or two thereafter, one of the three men returned on the same road the three had taken when they left. He was alone and was riding a large bay mare mule, which was shod, but witness could not say whether she was shod all around or not. About two days afterwards a man, whom witness now recognizes as J. S. Holden, came along on the same road and from the same direction as the young man who was riding the mule. Holden was inquiring for a stolen mule. Being requested to point out the man whom he saw riding the mule, the witness pointed out the defendant, and said he believed him to be the man.

Matt Terry, for the State, testified that he had known the defendant for years. Witness also knew John G. Hester, and was present when Hester was married in Gonzales county in February, 1882, but could not state the exact date of the marriage. Defendant was then living in that neighborhood, but was not present at the marriage of Hester. In March, 1882, witness hired to Mr. Burnett, to drive cattle from Gillespie and Mason counties to Kansas. With the exception of the defendant, all the hands hired for the drive came from their homes to the town of Gonzales, and started from there. Defendant joined the party just before they reached the town of San Marcos, in Hays county. While camped on the Perdinales river, witness and defendant spoke of Hester's marriage, and witness asked defendant why he was not at the wedding, to which the latter replied that he was not in the country at the time, and then, after studying for a moment, he added: "The night John G. Hester was married I was in Blanco county, on the Blanco river, and crossed it." From the middle of Llano county to the Blanco river, ten miles above the town of Blanco, the distance is about sixty or seventy-five miles.

C. Burnett, for the State, testified that in the latter part of January or early in February, 1882, having made up a drive to Kansas, he was looking for hands, and defendant hired to him, and was to ride wild horses for witness on the trail. Defendant and witness then lived in the same neighborhood. Witness did not again see the defendant until two or three days before J. S. Holden came into the neighborhood, about the eighteenth or

twentieth of said month, hunting for a mule. Witness asked defendant where he had been, and he replied: "Up the country, in the mountains." Defendant did not say in what county he had been, but during the conversation the witness understood he had been in Llano county, and asked him about certain residents of that county who were known to witness. Defendant replied that he had seen them, and that they were well. He further said that he would be ready to go on the trail with witness. Two or three days subsequently, witness saw J. S. Holden in Arrington's pasture, hunting for his mule. Holden remained several days in Gonzales county, hunting for the mule, during which time the witness did not see the defendant nor know his whereabouts. About the middle of March, 1882, when witness was preparing to start his drive, he notified his hands to meet him in the town of Gonzales on a certain day. Defendant told witness he did not want to go through the town of Gonzales, for, if he did, the officers would catch him, as he was accused of stealing a mule; but he would overtake the party above the town of Gonzales. He did so, and went through with the party to Wallace, Kansas, where he was discharged. Witness indentifies defendant at the bar as Frank Chew, and said he had not changed much since 1882, either in size or appearance, but then lcoked more like a boy than at present, and wore no whiskers on his face, as he now does.

L. M. Kokernot, for the State, testified that he knew the mule which the defendant was accused of stealing. Witness bought it in 1882, from Doctor Johnson, who got it from his son, George Johnson, now dead. Witness had known the mule for several months before he bought it, and kept it several months before it was proven away from him. He also knows J. S. Holden, who proved the mule away from him. He first met Holden in the town of Gonzales, and Holden described his lost mule so accurately, and witness was so well satisfied from his description that the mule was his, that witness told him to go and get it, and he did so.

W. E. Jones, sheriff of Gonzales county, testified that he captured the defendant in March, 1886, in Carter county, Montana, and brought him to Gonzales.

The State was then allowed to put in evidence the marriage license of J. G. Hester, and the minister's return thereon that he had duly executed it. The license was issued February 14, 1882, and was executed on the sixteenth day of the same month.

These were the papers referred to in the opinion, and the head-
note.

The State here closed.

T. Gipson, for the defense, testified that he lived in Blanco
county, and that the defendant and one Davis came to his house
between the first and tenth of February, 1882. They had no
live stock with them except the horses they were riding. They
stayed one night, and left the next morning in the direction of
Gonzales county. Witness was a cousin of defendant's step
father, John Gipson.

J. Putman, for the defense, testified that he lived in Kimball
county, and was a cousin of the defendant. About the middle
of January, 1882, the defendant and one Davis came to witness's
house, and remained there four or five days, during which time
they attended dances at different places. Defendant was riding
a small bay horse, and neither he nor Davis had any stock with
them except the horses they were riding. It is about eighty-five
miles from witness's place to the middle of Llano county, and
about twenty-two miles south from T. Gipson's. When defend-
ant and Davis left witness's place they started toward Gonzales
county, but he could not say where they went to.

H. A. Hobbs, for the defense, testified that in 1882, he lived in
about a mile and a half of W. B. Chew, of Gonzales county,
and that defendant lived at Chew's at that time. Witness had
known defendant since childhood. About the eighteenth or
twentieth of January, 1882, the defendant returned from a trip
he had been making somewhere, and witness did not know of
his going off any more until he left with Burnett in the succeed-
ing March. During that time the witness saw the defendant
every few days, and did not think that in February, 1882, he
could have gone to and returned from Llano county during any
interval between the times the witness saw him. Defendant
lived with his uncle, W. B. Chew, and was staying at Chew's
place when Holden was in that section of country.

W. B. Chew, for the defense, testified that the defendant was his
nephew, and had lived with him since he, defendant, was a small
boy. In December, 1881, defendant went to Llano county, where
he had relatives, and returned from there about the fifteenth
or eighteenth of January, 1882, from which time he was at home
or in the neighborhood until he left with C. Burnett. Defendant
was at witness's place while J. S. Holden was reported to be in
that neighborhood. During February, 1882, witness saw the de-

fendant every few days, and was satisfied that the defendant could not have gone to and returned from Llano county in any of the intervals between the times he was seen by witness. After defendant was accused of stealing Holden's mule, the witness charged his mind with the dates, etc. Witness lived four miles from Willis Arrington's ranch. Defendant is a little taller than he was in 1882, but his general appearance had not changed much since then except as to the beard on his face. In 1882 he had no beard, and was just turning out a short moustache.

John Gipson, defendant's step father, testified that on the night of February 8, 1882, the defendant, witness and four or five other persons slept at Tom Baker's, in Gonzales county, and on the following Tuesday defendant came to where witness was putting up a fence, and witness gave him a bridle bit. Witness fixed the date they stayed at Baker's by the fact that he got a check the same day from Willis Arrington on G. L. Dilworth, of Gonzales, and went to Gonzales the next day, got the check cashed, and bought fence wire.

By the almanac of 1882, the defense showed that the Tuesday referred to by the witness was the thirteenth day of February, 1882. The witness, on cross examination, stated that he was present at the preceding term of the court when the defendant was on trial upon this same charge, and that he did not testify at that trial, though he then knew the same facts as now. Witness was positive he never got but two checks from Arrington; one of which was for twenty-five dollars, and the other for sixty dollars. The former check he got in February, 1882, and the latter in January.

G. M. Dilworth, for the defense, testified that in January, 1882, he was a banker in the town of Gonzales. His books showed three checks charged to Willis Arrington; one of January 1, 1882, for sixty dollars, paid to —— Gipson; one of February 8, 1882, for twenty-five dollars, paid to John Gipson, and one of March, 1882, for eight dollars, paid to John Gipson. These dates were the dates of the payments, and not of the checks themselves. Witness could not state the dates of the checks, nor by whom they were presented for payment. Nor could he say to what Gipson the check for sixty dollars was paid, as his books did not give any other name than Gipson. Witness destroys original checks from time to time.

*Fly & Davidson*, for the appellant.

*Walter Weaver*, for the State.

HURT, JUDGE.  Since the judgment in this case must be reversed, we do not discuss the evidence, its sufficiency being questioned by appellant.

The conviction was for the theft of a mule, the evidence of the State being wholly circumstantial.  The defense of alibi was relied upon, to support which several witnesses were introduced whose testimony strongly tended to sustain this defense.  The State to show opportunity and to rebut the evidence in support of the alibi, put in evidence a statement of appellant that he was at a certain point on the Blanco river on the night of the marriage of one Hester; and, for the purpose of fixing the date of the marriage, introduced, over objection from appellant's counsel, the marriage license, with the certificate of the officiating clergyman attached, which had been recorded.  The point on Blanco river at which this statement of appellant's placed him, was in such proximity to the place where the mule was stolen, as produced that coincidence of time and place which rendered it possible for appellant to have been the taker.

Was the marriage license, or the attached certificate of the clergyman, if properly authenticated and recorded, admissible for any purpose in this case?  All marriage licenses are required to be recorded in a well bound book kept for that purpose; also, the certificate of solemnization must be recorded in like manner. (Rev. Stats., art. 2822.)

Now, while the license and certificate are required to be recorded, there is no law of this State making them, or either of them, or a certified copy of either of them, admissible for such purposes as that for which they are used in this case.  Appellant was no party to the instruments.  They were evidence of the acts of the clerk and the person solemnizing the rites, if evidence of anything.  They evidence acts *inter alios*, in which appellant had no part.  If Hester married on a certain day, the best evidence of the fact is the testimony of those who witnessed the ceremony.  The minister or other person present might testify to the facts; but certainly the certificate of the minister can not be used, simply because of its hearsay character.  The certificate is what he said in writing as to the time of marriage.  If he were on the stand, a cross examination might develop that he was mistaken as to the date.

We are of opinion that these documents were not competent

evidence by which to fix the date of Hester's marriage, and that the objection to their introduction should have been sustained. It will not be questioned that the proof made by these documents was of the highest importance, and, no doubt, contributed largely to the conviction of appellant.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*